IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

NORTH AVENUE CAPITAL, LLC,

Plaintiff,

v.                                                    CIVIL ACTION NO.  2:22-cv-00168

RANGER SCIENTIFIC LLC,

Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the court are cross-motions for summary filed by Defendant Ranger Scientific, LLC ("Ranger") [ECF No. 51], and Plaintiff North Avenue Capital, LLC ("NAC"), [ECF No. 53]. Because the motions raise substantially similar arguments in favor of summary judgment, I will dispose of them together. For the reasons stated herein, NAC's Motion [ECF No. 53] is **DENIED**, and Ranger's Motion [ECF No. 51] is **GRANTED**.

## I.    Background and Procedural History

In this declaratory action, the parties to a lending contract seek to clarify its terms regarding the accrual of interest. NAC is a specialized commercial lender that contracted with Ranger to finance the development of an ammunition manufacturing facility in Montgomery, West Virginia. [ECF No. 1]. On October 9, 2020, the parties agreed that NAC would provide Ranger with a $7.5 million loan to fund the facility.

[ECF No. 1-2]. As part of this loan, NAC and Ranger executed four separate agreements: a Loan Agreement, [ECF No. 53-2], a Term Note, [ECF No. 53-3], a Controlled Account Agreement, [ECF No. 53-4], and a Payment Reserve Account Agreement, [ECF No. 53-5], collectively referred to as the "Loan Documents." The Loan Documents work together to specify the parties' rights and obligations. [ECF No. 53-2].

The Loan Agreement is the primary agreement between the parties which, as relevant here, defines key terms, establishes conditions precedent to obtaining advancements of funds, explains the purpose of the other loan documents, and provides for remedies in the event of default. [ECF No. 53-2]. It provides that "the loan shall be in an amount not to exceed . . . [$7,500,000.00] (the "Loan") and shall bear interest at the Applicable Interest Rate on so much of the principal sum as shall be advanced pursuant to the terms of this Agreement and the Loan Documents." *Id.* § 2.01)(a)5.[1] The Loan Agreement further states that the "interest on the Note shall be calculated and due and payable in the amount, manner and at the times set forth [in the Term Note]." *Id.* § 2.02(a).

The Term Note is a secured promissory note that sets forth interest rate calculations for the loan. [ECF No. 53-3]. Its relevant language provides that Ranger "promises to pay . . . the principal sum of [$7,500,000], *or so much thereof as may be*

---

[1] Rather than the ECF page numbers, the court uses the page number of the Loan Documents or, if applicable, the particular contract section found in the Loan Documents to cite this document.

*hereinafter disbursed hereunder*, together with interest thereon . . . ." *Id.* at 2 (emphasis added).

The Controlled Account Agreement provides for the creation at closing of a bank account—controlled exclusively by NAC—to hold certain loan proceeds. [ECF No. 53-4]. This agreement acknowledges that Ranger shall not have "any right, title, or interest, whether express or implied, in the Controlled Account or to withdraw or make use of any amounts from the Controlled Account." *Id.* § 2(d). Instead, to utilize the proceeds, Ranger "may request disbursement" of construction, equipment, or working capital funds. *Id.* § 3(a)–(d).

Lastly, the Payment Reserve Account Agreement directs the establishment of an account containing $830,000 to be kept separate from the other loan funds. [ECF No. 53-5]. Like the Controlled Account Agreement, this document allows NAC to "control all moneys deposited into the . . . [a]ccount" with the funds being "subject to the sole dominion, control, and discretion of" NAC. *Id.* § 2(b). Ranger has no "right, title, or interest" in this account, but upon the successful completion of condition precedents, NAC will make disbursements to Ranger. *Id.* §§ 2(d), 4.

On October 9, 2020, NAC presumably placed the money in escrow,[2] and the parties executed a Loan Closing Statement, which summarizes the distribution of the principal sum at closing. [ECF No. 53-7]. The Closing Statement reports that of the $7.5 million loan, $180,000 went to acquisition of real estate, $13,530.71 went to the Kanawha County tax office, and $457,500 was disbursed for various fees and

---

[2] The disagreement pertaining to the escrow account documents will be discussed more below.

expenses. *Id.* at 1–2. Further, a total of $7,164,839.29 was distributed back to NAC: $830,000 went to the Payment Reserve Account, $6,018,929.29 to the Controlled Account, and the rest was used for "various fees and expenses paid by NAC." [ECF No. 57, at 11]. The parties acknowledged that the disbursements "represent[ed] funds received in connection with this transaction," and "Borrower acknowledge[d] receipt of the funds through disbursing the settlement proceeds . . . ." [ECF No. 53-7, at 3].

In May 2022, NAC filed this declaratory judgment action, pursuant to 28 U.S.C. §§ 2201–02, to resolve a disagreement between the parties over the accrual of interest. [ECF No. 1]. This dispute centers around the meaning of "disbursed" in the Loan Documents.[3] The Term Note allows interest to accrue on the principal sum or funds *disbursed hereunder*, [ECF No. 53-3, at 2], but "disbursed" is not defined in the documents. However, the definition of "Funding" means "the act of [NAC] *disbursing* money to [Ranger] or for the benefit of [Ranger]." [ECF No. 53-2, § 1.01 ("Funding")]. Thus, the question is what funds have been *disbursed hereunder* to Ranger or for its benefit. Specifically, the parties dispute the amount on which Ranger currently owes interest: the principal sum of $7.5 million or only on the amount "actually disbursed" to Defendant, which, according to Ranger, was only $2,545,363.53 as of February

---

[3] Despite the meaning of "disbursed" being at the very heart of this case, Plaintiff at times—rather carelessly—uses the term "dispersed" instead. *See* [ECF No. 57, at 1 (asserting that Defendant's argument "is not consistent with the broad definition of 'funding' that guides the meaning of *dispersal* under the loan")]; *see also* [ECF No. 59, at 2 ("Such a delivery of funds at closing constituted a 'dispersal' within the meaning of the Term Note.")]; *id.* ("NAC's broad interpretation of 'dispersed' . . . can explain and give full effect to all provisions in the Loan Documents . . . ."). As disburse and disperse are not synonymous, the court will presume this to be a thoughtless error and will not construe NAC's briefing to purposefully imply that its funds were scattered.

4

2021. [ECF No. 52, at 12]. Both parties have moved for summary judgment. [ECF Nos. 51, 53]. The issues have been fully briefed and the matter is ripe for review.

### A. The Dispute

NAC asks the court make three declarations: "(a) interest accrued on the $7.5 million loan to Ranger starting on October 9, 2020, pursuant to the loan agreement; (b) interest is due and payable by Ranger on the full amount of $7.5 million; and (c) NAC properly calculated Ranger's interest charges under the Loan Agreement and Term Note." [ECF No. 53, at 2]. NAC argues that the plain text of the Loan Documents "establishes that Ranger's obligation to repay interest accrued on the $7.5 million at closing." [ECF No. 54, at 10]. NAC asserts that placing the entire loan principal into escrow constituted a disbursal "for the benefit of" Ranger, and thus, the full principal sum is the same as the amount "disbursed hereunder." *Id.* (first quoting [ECF No. 53-3, at 1]; and then quoting [ECF No. [53-2, § 1.01, "Funding"]).

NAC also urges the court to have a broad interpretation of the word "disburse" to "encompass both the funds that NAC delivered to escrow and the loan accounts *as well as* funds released directly to Ranger from the loan accounts." [ECF No. 57, at 13]. NAC contends that this interpretation gives full effect to all the provisions in the contract. [ECF No. 54, at 11]. To support this argument, NAC highlights how the first interest-only payment was due twenty-three days after the loan closing date, thereby proving that interest accrued immediately. *Id.* at 11–12.

Ranger, on the other hand, requests this court to "declare that interest accrued only upon funds that were actually disbursed."[4] [ECF No. 51, at 1]. And as of February 2021, the amount disbursed "for Defendant's use and benefit . . . [only] totaled $2,545,363.43." [ECF No. 52, at 12]. In support of its position, Ranger asserts that their agreement allows the loan to only "bear interest . . . on so much of the principal sum as shall be advanced . . . ." *Id.* at 8 (quoting [ECF No. 1-1, at 7]). Ranger focuses on the term "advanced" in the Loan Agreement, which authorizes NAC to charge interest "on so much of the principal sum as shall be advanced." *Id.* (quoting [ECF No. 1-1, at 7]). Wiring money to an escrow account only to be returned to NAC is not, according to Ranger, disbursing nor advancing the full loan proceeds. *Id.* at 10.

Ranger agrees that all terms of the Loan Documents must be interpreted as a whole and read to avoid inconsistencies among provisions. *Id.* at 8. And because NAC's interpretation—that all $7.5 million was disbursed at closing— conflicts with the conditions precedent required to obtain "any requested Funding," NAC's understanding of the Loan Documents is mistaken. *Id.* Moreover, NAC cannot charge interest on undisbursed funds, and wiring money to an escrow agent, "only to have it returned to Plaintiff's accounts, is not disbursing . . . ." *Id.* at 10.

NAC asserts that Ranger's interpretation would "reduce the loan to a mere line of credit," yet the provisions of the Loan Documents, such as penalization of early repayment, are typical for loans but not lines of credit. *Id.* Last, NAC points to a

---

[4] In its memorandum, Ranger specifies that the court should "determine that interest was only due and owing on the funds that was provided for use for Defendant and declare that Plaintiff's practice of charging interest on the full $7.5 million violated the loan documents." [ECF No. 52, at 12].

disjunctive meaning of "or" in the Term Note, which allows "principal sum" and "disbursed hereunder" to retain separate meanings. [ECF No. 59, at 3]. Thus, interest can accrue on either the principal sum *or* the amount disbursed hereunder. *Id.*

## II. Legal Standard

### a. Declaratory Judgment

Under the Declaratory Judgment Act, a district court may, in a case or controversy otherwise within its jurisdiction, "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). A declaratory judgment action "is appropriate 'when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)).

### b. Summary Judgment

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). The moving party may meet its burden of showing that no genuine issue of

material fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). Rather, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation omitted). "When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.*

## III. Discussion

### a. Jurisdiction

Before reaching the merits, I will briefly discuss this court's subject matter jurisdiction. I am satisfied that a declaratory judgment will determine the legal relationship between the parties and terminate the uncertainty in the Loan Documents that gave rise to this proceeding. *See Centennial Life Ins. Co.*, 88 F.3d at 256. But the court is aware that such a determination could very well influence another subsequently filed legal proceeding that is pending in this court. And "it is

8

well settled that the declaratory remedy should not be invoked merely to try issues or determine the validity of defenses in pending cases." *Nitro Constr. Servs., Inc. v. D'Aquila*, No. 2:18-cv-01510, 2019 WL 1521982, at *4 (S.D. W. Va. Apr. 8, 2019) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321 (4th Cir. 1937)). Nevertheless, the court finds that declaratory judgment is appropriate here. Because NAC did not file the related lawsuit until *after* this declaratory judgment action, the requested remedy here was not invoked to "interfere with an action which has already been instituted." *Quarles*, 92 F.2d at 325; *see also Learning Network, Inc. v. Discovery Commc'ns, Inc.*, 11 F. App'x 297, 300 (4th Cir. 2001) ("The Fourth Circuit has recognized the 'first to file' rule of the Second Circuit, giving priority to the first suit absent showing of a balance of convenience in favor of the second.") (citing *Ellicott Mach. Corp. v. Modern Welding Co., Inc.*, 502 F.3d 178, 180 n.2 (4th Cir. 1974)). There being no such showing in favor of the other litigation, the court will proceed to the merits of the cross-motions for summary judgment.

## A. Factual and Evidentiary Dispute

As a preliminary matter, the court is aware of an evidentiary dispute between the parties regarding the production of certain bank account records. Ranger claims that there is no evidence NAC wired money to the escrow agent. *See* [ECF No. 55, at 4 ("Plaintiff presents no evidence establishing that such funds were actually wired to escrow and the only bank records it disclosed in discovery do not establish that it wired the funds.")]; *accord* [ECF No. 52, at 10]. After Ranger asserted this position,

9

NAC provided bank statements that contradict Ranger's factual challenge that NAC never delivered the loan to the escrow agent. [ECF No. 56, at 113–18 ("Exhibit G")].

In reply, Ranger asks the court to strike these bank statements from the record. [ECF No. 58, at 6]. Ranger argues that NAC never previously disclosed this evidence despite filing a motion to compel the bank statements. *Id.* NAC, in its own reply, admits that the evidence in controversy had not been previously disclosed to Ranger; however, NAC asserts this mistake was inadvertent and harmless. [ECF No. 59, at 10].

The court does not find it necessary to consider these bank statements in making its ruling on the present motions. First, Ranger's argument assumes NAC transferred the money to escrow, despite having no evidence of such transfer. *See* [ECF No. 52, at 9 ("By Plaintiff's reading, however, it 'advanced' the loan proceeds when it allegedly wired money to the escrow agent who then returned the money back to Plaintiff.")]; *id.* ("[S]hifting money to the escrow agent who then returns the same is not an advance . . . ."); *id.* at 10 ("But allegedly wiring money to the escrow agent . . . only to have it returned to Plaintiff's accounts, is not disbursing . . . ."). Next, as both parties ask the court to declare judgment on a legal question regarding the meaning of contractual terms, the factual dispute about whether the funds were originally placed in escrow will not affect the outcome of the judgment. *See Observer Publ. Co.*, 597 F.3d at 576 ("Facts are 'material' when they might affect the outcome of the case."). Thus, there is no dispute of material fact that precludes the court from considering the merits of the cross-motions and declaring judgment in this matter.

### B. The Cross-Motions

"Contract interpretation is a subject particularly suited for summary judgment disposal." *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 835 (4th Cir. 1999) (citing *Metalex Corp. v. Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th Cir. 1988)). "The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face." *C&O Motors, Inc. v. Gen. Motors Corp.*, No. 2:05-cv-835, 2006 WL 3487648, at *4 (S.D. W. Va. Dec. 1, 2006). "A contract is not ambiguous merely because the parties disagree as to the meaning of the language they used to express their agreement." *Tpk. Ford, Inc. v. Ford Motor Co.*, No. 2:05-cv-00398, 2008 WL 282791, at *4 (S.D. W. Va. Jan. 31, 2008) (citing *Tri-State Asphalt Prods., Inc. v. Dravo Corp.*, 412 S.E.2d 225, 230 (W. Va. 1991)). Instead, a contract's language "must be considered and construed as a whole, giving effect, if possible, to all parts of the instrument." *Moore v. Johnson Serv. Co.*, 219 S.E.2d 315, 317 (W. Va. 1975).; *see also* Syl. Pt. 3, *Antero Res. Corp. v. Directional One Servs. Inc. USA*, 873 S.E.2d 832 (2022) (allowing courts to determine the intention of the parties "from an examination of the whole instrument, which should be so construed, if possible, as to give meaning to every word, phrase and clause and also render all its provisions consistent and harmonious").

While the parties highlight many different contract provisions in their respective arguments, the Loan Agreement and the Term Note contain the relevant language concerning interest rates. The Loan Agreement declares that the loan "shall

bear interest at the Applicable Interest Rate on so much of the principal sum as shall be advanced pursuant to the terms of . . . the Loan Documents." [ECF No. 53-2, § 2.01]. The Term Note provides that Ranger "promises to pay . . . the principal sum of [$7,500,000], or so much thereof as may be hereinafter disbursed hereunder, together with interest thereon . . . ." [ECF No. 53-3, at 1].

The parties do not argue the contract is ambiguous, but each offers its own ostensibly unambiguous interpretation as to when and how disbursement occurs. And the fact that the parties contest the meaning of "disbursed" does not by itself render the Loan Documents ambiguous. *See Tpk. Ford, Inc.*, 2008 WL 282791, at *4. Instead, a reading of the Loan Documents as a whole, "giving effect . . . to all parts of the instrument," *Moore*, 219 S.E.2d at 317, makes evident that NAC did not disburse the entire $7.5 million on the date of closing to Ranger or for Ranger's benefit.

NAC requests summary judgment because, in its view, the unambiguous terms of the Loan Documents allow interest to accrue on the full $7.5 million from the October 9, 2020, closing date. [ECF No. 54, at 10]. I find NAC's arguments unconvincing.

Per the Loan Agreement, "funding" occurs when the "Lender disburs[es] money to Borrower or for the benefit of Borrower." [ECF No. 53-2]. The Loan Closing Statement indicates that the escrow agent was to return $6,018,969.29 to NAC to fund the Controlled Account and $830,000 to NAC for the Payment Reserve Account. [ECF No. 53-7]. Having been returned to NAC, such funds were not disbursed. Thus, it is of no importance that Ranger "acknowledge[d] receipt of the funds through

disbursing the settlement proceeds pursuant to the Loan Closing Statement," [ECF No. 54, at 8 (quoting ECF No. 53-7)], because the Closing Statement demonstrates, and NAC does not dispute, that most of the money was returned to NAC. *See* [ECF No. 57, at 11 (acknowledging that "[t]he $7,164,839.29, which NAC received back from [the escrow agent]" was for various fees, and for the controlled and payment reserve accounts)].

Other provisions in the Loan Documents confirm the court's conclusion that the entire $7.5 million loan was not disbursed at closing. First, Section 4.03 of the Loan Agreement includes terms that "relate to the disbursement of funds from the *undisbursed* proceeds of the Loan under this Agreement." [ECF No. 53-2 § 4.03]. In outlining the procedures for advances, this section explains how Ranger "shall apply only for disbursement" for "work actually done" by the general contractor. *Id.* § 4.03(b). And Section 4.02, which addresses conditions precedent to funding, require that any work done "at the stage of renovation *for which disbursement is requested* shall have been done in a good and workmanlike manner." *Id.* § 4.02(j) (emphasis added). Because contracts "must be considered and construed as a whole," *Moore*, 219 S.E.2d at 317, NAC's interpretation that "disbursed" broadly encompasses funds delivered to escrow and the loan accounts would render these other provisions contradictory. If NAC were correct that placing funds into the loan accounts constitutes a disbursal, this money could not be considered "undisbursed proceeds," even if it may be re-disbursed at a later point.

13

Next, even if placing funds into the respective accounts constituted a "disbursal," the language governing the accounts does not suggest those funds were so disbursed *for the benefit of Ranger*. The Controlled Account Agreement establishes that NAC "shall control all moneys deposited" in the account, and "no interest or earnings shall be payable to [Ranger] on the [account]." [ECF No. 53-4, §2(b)]. Indeed, the Controlled Account funds were "subject to the sole dominion, control, and discretion of [NAC]," which had "complete and sole discretion" to use and apply the funds. *Id.* Ranger had no "right, title, or interest, whether express or implied, in the Controlled Account . . . [and could not] withdraw or make use of any amounts from the Controlled Account." *Id.* The provisions in the Payment Reserve Account Agreement are identical. *See* [ECF No. 53-5, § 2(d) ("Borrower acknowledges and agrees that . . . neither Borrower nor any person claiming on or behalf of, or through, Borrower shall have any right, title or interest, whether express or implied, in the Payment Reserve Account, or to withdraw or make use of any amounts from the Payment Reserve Account.")].

To access the funds in the Controlled Account, Ranger could "request disbursement" but first had to satisfy certain conditions precedent before receiving any funds. *See* [ECF No. 53-4, § 3(a) (allowing requests for disbursement of Construction Funds "upon completion of the requirements outlined in Article IV of the Loan Agreement")]; *id.* § 3(b) (requiring requests for disbursement of equipment funds to be "in a form approved by the [NAC]" and allowing NAC to "approve said request in its sole discretion"); *id.* § 3(c) (requiring [Ranger] to request disbursement

of Working Capital Funds via a request template, acceptance of which was subject to [NAC's] sole discretion). Likewise, in the Payment Reserve Account Agreement, "[u]pon Borrower's completion of each and every condition precedent . . ., [NAC] shall release the contents of the Payment Reserve Account to Borrower." [ECF No. 53-5, § 4(a)]; *see also id.* § 4(b) ("Disbursements shall be made to Borrower only if each of the [eight listed] conditions precedent have been satisfied.").

In all, the provisions of the Loan Documents make clear that Ranger had no right, title, interest, or control of any of the funds in the accounts unless and until Ranger requested disbursement of such funds. It is difficult to discern how these funds—of which Ranger cannot derive any use without NAC's approval—were disbursed into the accounts "for Ranger's exclusive benefit," [ECF No. 54, at 11], or for the benefit of Ranger at all. Under NAC's interpretation, Ranger owes interest on funds that it may not use, cannot access, and does not have any control over. While these funds may eventually benefit Ranger once disbursed to either Ranger or a third party, I fail to see how the funds benefit Ranger in any way while in NAC's exclusively controlled accounts.[5] And, as discussed above, the fact that the contracts explicitly provide for further disbursements only underscores the implausibility of NAC's preferred interpretation.

---

[5] It is important to note, however, that this construction does not render meaningless the phrase "or for the benefit of Borrower," [ECF 53-2, § 1.01 ("Funding")], because, as the agreement contemplates, funds can still be disbursed for the benefit of Ranger without going to Ranger directly. The Loan Agreement allows for Lender, "at its sole option, [to] directly pay the general contractor and any subcontractors or other parties the sums due under the construction contract." *Id.* § 4.03(c). This would surely constitute a disbursal for the benefit of Ranger.

Instead, I find that the construction of the Loan Documents supports Ranger's position that interest can accrue only on that which has been disbursed *to Ranger* or *for Ranger's benefit* but not on the entire principal amount. The Loan Agreement states that NAC's "obligation to make any Funding under this Agreement for the Improvements shall be subject to the fulfillment to [NAC's] satisfaction of the conditions listed below." [ECF No. 53-2, § 4.02]; *see id.* § 1.01 (defining "Improvements" as both the "construction of a facility located" in Montgomery, WV, and "such other construction or renovation as may be approved by [NAC]"). Substituting "Funding" in Section 4.02 with its contractual definition establishes that NAC's obligation to make "any act of . . . disbursing money to [Ranger] or for the benefit of [Ranger]" is subject to the fulfillment of certain conditions.[6] Thus, the amount disbursed at closing on October 9, 2020 could not comprise entire principal sum of $7.5 million, and NAC could later disburse funds to Ranger or for Ranger's benefit subject to the contractual terms.

NAC's response—that "'disbursed' is a broad and flexible term" that encompasses both the funds NAC delivered to escrow and funds that it released to Ranger directly, [ECF No. 57, at 13]—is unpersuasive. As mentioned, the funds in the loan accounts were not for the benefit of Ranger because Ranger had no right, title, control, or interest in the accounts. Yet under NAC's interpretation, Ranger

---

[6] These conditions include but are not limited to: Lender approving a list of contractors; Lender accepting a complete set of written plans and specifications for the project; Borrower submitting a satisfactory timetable for the project with a budget of costs; Borrower delivering insurance policies to the lender regarding the projects; and Borrower providing proof of the general contractor's compliance with worker's compensation laws. [ECF No. 53-2, § 4.02(a)-(q)].

would still have to pay interest accrued on those inaccessible funds. Ranger may never have a right to these funds if it does not satisfy the conditions precedent.

Finally, my understanding of the agreement is also based upon the Term Note's interest provision as a whole. Simply put, the meaning of "or" in this provision does not change my understanding of the agreement. As stated, the Term Note provides that Ranger "promises to pay . . . the principal sum of [$7,500,000], *or* so much thereof as may be hereinafter disbursed hereunder, together with interest thereon . . . ." [ECF No. 53-3, at 1]. NAC construes this provision to mean that it can choose to charge interest on *either* the principal sum or what was disbursed hereunder because of the disjunctive meaning of "or." [ECF No. 59, at 2–3]. But a more natural reading of this provision, rather than empowering NAC to choose which amount to charge interest, simply allows interest to accrue on a smaller amount if the entire principal sum had not been disbursed. First, while "the word 'or' is almost aways disjunctive, . . . [and] the words it connects are to be given separate meanings," *Rush v. Kijakazi*, 65 F.4th 114, 119 (4th Cir. 2023) (quoting *United State v. Woods*, 571 U.S. 31, 45–46 (2013)) (internal citations omitted), NAC is urging that "principal sum" and "disbursed hereunder" should mean the same thing. *See* [ECF No. 59, at 3 ("[T]here is no difference in this case between the principal amount and the amount that was 'disbursed.'")]. Moreover, the contract's language states that *Ranger* shall pay interest on either the principal sum or amount disbursed, but it does not authorize NAC to choose what amount interest is owed on—a notable omission given other provisions' explicit grants of plenary authority. But NAC cannot have its cake

17

and eat it too. And in this case, the amount disbursed to Ranger or for Ranger's benefit, as of February 2021, is less than $7.5 million.

When construing the Loan Documents to "give meaning to every word, phrase and clause, and also render its provisions consistent and harmonious," Syl. Pt. 2, *Antero Res. Corp.*, 873 S.E.2d at 834, the unambiguous language of the contract makes clear that the entire loan was not disbursed at closing. As such, there is no dispute as to material fact, and Ranger is entitled to judgment as a matter of law because the terms of the Loan Documents only allow interest to accrue on funds actually disbursed to Ranger or for Ranger's benefit. Thus, for the foregoing reasons, NAC's motion for summary judgment is **DENIED**, and Ranger's motion is **GRANTED**.

IV.    **Conclusion**

For the foregoing reasons, the court **DECLARES** that interest accrued only upon funds that were actually disbursed to Ranger. As such, NAC's Affirmative Motion for Summary Judgment is **DENIED**, and Ranger's Motion for Summary Judgment is **GRANTED**. The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:    September 15, 2023.

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

18